Robert L. PETTY and Patricia L. Petty, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C 78–4083.

United States District Court, N. D. Iowa, W. D.

Dec. 31, 1980.

Wiley Mayne, John D. Mayne, Sioux City, Iowa, for plaintiffs.

James H. Reynolds, U. S. Atty., Cedar Rapids, Iowa, Jeffrey Axelrad, Director, Torts Branch, Civ. Div., Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

O'BRIEN, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, in conjunction with the National Swine Flu Immunization Act of 1976, 42 U.S.C. §§ 247b(j)–(*l*). The action was transferred shortly after filing to the District of Columbia for coordinated pre-trial proceedings. Upon completion of those proceedings, the case was remanded to this district for trial. After fully considering this matter, the Court finds in favor of plaintiff and enters judgment in the amount of $212,807.22 with interest and costs of this action as provided by law. This finding is fully supported in the contents of this order.

## INTRODUCTION [1]

The Swine Flu Act of 1976 was an attempt by the Federal Government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history, and over 45 million Americans—or one-third of the adult population—were vaccinated. The initial vaccination was on October 1, 1976, and the program was suspended on December 16, 1976. The program, for which $135 million was initially appropriated by Congress, called for using both private and public health care systems to achieve its goal of inoculating the entire adult population by the end of November 1976. The November deadline was critical since the season of intense flu transmission in the United States is generally considered to be September through March.

The Swine Flu Act became law on August 12, 1976 and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:

1. The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation resulting from the act or omission of a program participant upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty; 42 U.S.C. § 247b(k)(2)(A); [1A]

2. It makes that cause of action the exclusive remedy (42 U.S.C. § 247b(k)(3)) and abolishes the cause of action against the vaccine manufacturer; and

---

1. This introduction is taken from *Bean v. United States of America*, 533 F.Supp. 567 (D.C. Colo.1980). The Court is using this introduction because it believes it is a clear concise statement of the situation necessary for a full understanding of this matter. Certain authorities and footnotes from *Bean* have been omitted here.

1A. The Multidistrict Court held that nothing in the Swine Flu Act itself bars a plaintiff from demonstrating that the United States had a duty to warn vaccinees. (Final Pre-Trial Order, p. 2).

3. It makes the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act (42 U.S.C. § 247b(k)).

The program was prompted in part by the medical discovery in early February 1976 at Fort Dix, New Jersey, of military servicemen having a new strain of influenza virus antigenically related to the virus prevalent during the 1918–19 swine flu pandemic. That pandemic was responsible for 20 million deaths worldwide, including 500,000 in the United States alone. Prior to 1930, this strain was the predominant cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional transmission from swine to human, with no secondary person-to-person transmission.

In addition, the Swine Flu Act was prompted by the collapse of the commercial liability insurance market, both for vaccine manufacturers and other program participants. The cases of *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968), and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974), which held a manufacturer of polio vaccine strictly liable in tort, greatly contributed to the insurance problem. For this reason, the Swine Flu Act provided that the exclusive remedy for injury caused by the vaccine would be against the United States. However, since the manufacturers could still insure themselves against negligence liability, they may be liable in a suit by the United States (42 U.S.C. 247b(k)(7)) if the United States is found to be liable on a negligence theory.

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–77. As can be expected, however, many people who were inoculated also incurred some type of illness, injury or adverse medical condition in a period relative to the vaccination. Lawsuits, such as the instant one, were filed throughout the country for illnesses allegedly resulting from the immunization. In addition, numerous administrative claims have been filed.

*Findings of Fact* [2]

1. Plaintiff Robert L. Petty is a resident of the State of Iowa and the County of Plymouth therein.

2. On October 31, 1976, Robert L. Petty received a swine flu inoculation during a vaccination clinic conducted at the Municipal Auditorium in Sioux City, Iowa by the Sioux City-Woodbury County Health Department under direction of the Iowa State Health Department as a part of the National Swine Flu Program. Sioux City is located in the Western Division of the Northern District of Iowa.

3. Prior to going to the vaccination clinic, plaintiff had seen and heard advertisements in the newspaper and on television and radio that stated there was a very good possibility of a swine flu epidemic that would reach throughout the United States (plaintiff's deposition at p. 40, Government's Exhibit A, p. 7) and the federal government was taking steps "to protect us from this epidemic" by providing "shots" or vaccinations at the Auditorium (plaintiff's deposition pp. 5, 40). Plaintiff also saw President Ford on television taking the shot and saying it would be good for all Americans to be vaccinated because of the strong possibility of an epidemic. Plaintiff was persuaded by the advertisements and by the television coverage of the President to go down to take the shot (plaintiff's deposition at p. 7). Plaintiff believed his Government would never do anything that would have a harmful effect on him (plaintiff's deposition at p. 38) and does not recall reading or hearing anything derogatory about the shot (plaintiff's deposition, p. 40).

4. When plaintiff arrived at the clinic, he and his wife got into a line which had already formed waiting for the shot. While waiting in line, he was handed a copy of joint Exhibit C (also identified as MDL Document 473 and plaintiffs' Exhibit 22) and told he would have to sign it in order to

**2.** At the outset the Court believes it is important to note this is not a Guillain-Barre Syndrome (GBS) case. In GBS cases, the Government admitted liability if causation could be shown.

get the shot.[3] He proceeded down the line, glanced at the paper, Government's Exhibit B "skimming" through it, and signed and surrendered it before a shot was administered to his left arm by jet gun.[4] This document was the only document which was given or made available to plaintiff or seen by him at the clinic and was the only information made available to him by the defendant or by program participants other than what he may have indirectly seen or heard through the news media. At the time he saw joint Exhibit C he understood it to tell him that persons allergic to eggs might experience a mild reaction or effect of possibly a sore arm or muscle for a day or two, but that was all (plaintiff's deposition at pp. 6, 7). Plaintiff testified that he did not believe he had been given an adequate warning of the possible consequences, and if such a warning had been given in the advertisements, he would have made a better judgment on whether to take the shot (plaintiff's deposition, p. 39). Joint Exhibit C represents defendant's effort to comply with the Swine Flu Act's requirement for the "development . . . and implementation of a written informed consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered", as found at 42 U.S.C. § 247b(j)(1)(F). (Form also was to include advice re rights and remedies.)

5. Plaintiff's previous good health continued until the afternoon of Monday, November 8, 1976[5] when, while at work as an electrician in a private residence, he felt his first symptom of which he complained at trial. The great toe of his left foot became numb and the numbness ascended his left leg and descended his right leg. His joints and muscles started to ache and he quit work and went home, where he had to be helped out of his truck into the house. His symptoms progressed to include a sore throat and difficulty with breathing. Mr. Petty was admitted to the hospital, where he started to have spiking fevers[6] and fluid accumulated in the area of his heart. His breathing was difficult, and severe chest pain was diagnosed as "congestive heart failure." Plaintiff remained in the hospital under Dr. Hyden's care with few signs of improvement. However, following the administration of steroids by his doctor on November 26, 1976, plaintiff's symptoms substantially subsided within 24 hours. The doctor tried to cut back on the steroids, and the symptoms returned and regressed again with steroid administration. Mr. Petty remained in the hospital until released to go home by his doctor on December 8, 1976. While in the hospital, plaintiff lost 50 pounds. He was released for work on March 30, 1977 and he returned to his previous employment until the fall of 1977, when he switched jobs to his present employment, also in the electrical contracting business.

6. Mr. Petty's doctor, Dr. Hyden, testified that in his medical opinion, the vaccination of October 31, 1976, was the cause of Mr. Petty's sickness, diagnosed as serum sickness-like[6A] reaction to a foreign protein. The diagnosis was the result of the patient's history and the progress of the treatment. Dr. Hyden stated at trial that he could not say whether or not Mr. Petty's condition was permanent. Just prior to trial Dr. Hyden had examined plaintiff and the tests and physical examination disclosed that Mr. Petty's present complaints were mental and that the doctor could find no physical cause for them. At trial, Mr. Petty complained of aches in his joints and muscles which limited his physical ability to do certain work at

---

3. See Appendix "A" attached hereto.

4. Immediately after receiving the vaccine, an attendant examined plaintiff's arm and said something was wrong with his arm. However, after being examined further, plaintiff's arm was found to be all right. No connection between this incident and plaintiff's subsequent illness has been established.

5. Eight days after receiving the shot.

6. The Court has been informed by Dr. Hyden's office that the term "spiking fever" merely means "running a fever" or "getting a fever" or a "sudden fever."

6A. See Exhibit 28, p. 4, ¶ 2.

home and on the job and impaired many leisure and social activities, all of which he had done prior to these symptoms.

7. The Court finds that the plaintiff did suffer serum sickness and a neurological disorder which was caused by the swine flu inoculation.

8. Shortly after the swine flu program went into effect, a surveillance-reporting group was established. The surveillance-reporting system covering 48,161,019 vaccinations given under the National Influenza Inoculation Program of 1976 had less than $\frac{1}{100}$ of one percent, or 4,733 cases reporting 236 diagnosed categories of occurrences following the vaccine. These included everything from death to fever, pregnancy, alcoholism and a broken clavicle. The epidemological analysis of the reports indicated an unexpected rate of reports of Guillain-Barre syndrome, but no other illness or even death in higher than statistically expected rates.

## LEGAL CONCLUSIONS

■ Under the Federal Tort Claims Act, the United States is only liable for negligence or wrongful acts or omissions of its employees while acting within the scope of their office or employment. 28 U.S.C. § 1346(b). This has been interpreted to mean that the United States may not be held liable on theories of strict or absolute liability. *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), *reh. den.* 346 U.S. 841, 74 S.Ct. 13, 98 L.Ed. 362, 346 U.S. 880, 74 S.Ct. 117, 98 L.Ed. 386, 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078; *Bean v. United States of America*, 533 F.Supp. 567, No. 79–F–571 (D.C.Colo., Aug. 19, 1980). The United States was intended by Congress to be the sole defendant in suits arising from the national swine flu program and hence would be substituted as sole party defendant. *See Low v. United States*, 463 F.Supp. 948 (E.D.Va.1978).[6B]

■ In regard to the swine flu vaccination program, the Government was authorized and directed under 42 U.S.C. 247b(j)(1)(F) as follows:

The development, in consultation with the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, and implementation of a written informed consent form and procedures for assuring that the *risks* and *benefits* from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered. Such consultation shall be completed within two weeks after enactment of this Act, or by September 1, 1976, whichever is sooner. Such procedures shall include the information necessary to advice [sic] individuals with respect to their *rights* and *remedies* arising out of the administration of such vaccine. (Emphasis added.)

The Court will first take up the clause, "Such procedures shall include the information necessary to advice [advise] individuals with respect to their rights and remedies arising out of the administration of such vaccine."

A careful look at the required "informed consent form," Exhibit "B", shows that it is hardly that. First of all it is called a "Registration Form;" nowhere do the words "informed consent" or "consent" appear. The individual is not advised with respect to his "rights and remedies" which may arise out of the administration of the vaccine.

The potentially most binding words in the "Registration Form" are, "I understand the risks of vaccination." It does not say, "I assume the risks and waive any remedy I may have."

When Congress said to inform them of their "rights and remedies", it must be assumed that it meant just that. This Court cannot believe that Congress authorized the Secretary and the National Commission to withhold the fact that if they took the shot after signing the "Registration Form" and then suffered personal injury or death, that they had no remedy. Congress said to tell them of their remedies, and this clearly implies that they must be told if they have no remedy.

6B. All as set out in "Final Pre-Trial Order," page 2.

Further, this Court feels that it was misleading and much less than candid for the Government to imply to participants that you are "registering" when they now argue to the Court that what they really meant to tell participants, "You are waiving your right to sue."

This Court concludes that there was no "informed consent form" as required by 42 U.S.C. 247b(j)(1)(F). The warning was inadequate and the drafters of the form acted negligently in light of the Congressional directives.

█ This Court will, however, in order to make a more complete record for appeal, further consider the proposition that there was in fact an informed consent form. The Government had a duty to warn and inform potential vaccinees fully of the "risks and benefits" of receiving the swine flu vaccine pursuant to the Swine Flu Act and FTCA. 42 U.S.C. § 247b(j)(1)(F). It is not only liable for its own negligence under said acts, but is also under the Swine Flu Act liable "in the shoes of program participants" to the same extent that program participants would have been liable under the law of the state where the act or omission occurred. As previously set out, the Government's duty was explicitly set forth in § 247b(j)(1)(F) as the "development and implementation of a written consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered." The plain language of this section makes it clear that the statutory standard requires the Government to warn of all risks and accurately explain all benefits.

The crux of the matter is whether or not the "registration form", together with the "important information sheet", signed by plaintiff herein provided sufficient information to enable plaintiff to render an "informed consent" to be vaccinated. This exhibit was offered at trial as Joint Exhibit C and the bottom form of this exhibit, which was signed by plaintiff, was designated as Exhibit B. After describing the disease and vaccine, this document discusses possible vaccine side effects and special precautions. Under possible side effects, it is stated:

Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache or muscle ache within the first 48 hours.

Under the heading "Special Precaution" is the following:

As with any vaccine or drug, the possibility of severe or potential fatal reactions exist. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances, people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

—Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.

—People with known allergy to eggs should receive the vaccine only under special medical supervision.

—People with fever should delay getting vaccinated until the fever is gone.

—People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

At the bottom of the sheet patients are directed to ask any questions about the flu or flu vaccine which they might have.

The signed registration form states: "I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, . . . and understand the benefits and risks of flu vaccination. I request that it be given to me . . . ." (See Appendix A for the complete registration form, attached hereto.)

The same issue involved herein was also involved in the case of *Bean v. United States*, 533 F.Supp. 567 (D.C.Colo.1980). The *Bean* case has an enlightening discussion concerning many of the same arguments presented here. In *Bean*, the Court

found that the warning provided on the same registration form to the plaintiff was sufficient to provide the plaintiff with adequate information to make an informed decision as to whether she should be vaccinated. In so concluding, the Court relied on *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir.1972), *cert. den.* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).[7] In *Canterbury*, the Court held that the duty to disclose is not determined by medical custom; rather, it depends on the patient's right to know and to consent to the treatment. The Court in *Bean, supra* at 575, cited a passage from *Canterbury* which stated:

> In our view, the patient's right of self determination shapes the boundaries of the duty to reveal. That right can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The scope of the physician's communications to the patient then must be measured by the patient's need, and that need is the information material to the decision. Thus, the test for determining whether a particular peril must be divulged is its materiality to the particular decision: All risks potentially effecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination of treatment, the law itself must set the standard for adequate disclosure ... no less than any other aspect of negligence, the issue of non-disclosure must be approached from the viewpoint of the reasonableness of the physician's divulgence in terms of what he knows or should know to be the patient's informational needs. If, but only if, the factfinder can say that the physician's communication was unreasonably inadequate

is an imposition of liability legally or morally justified.[8]
*Canterbury, supra* at 786–87.

The Court in *Bean* also stated:

> In determining the breadth of disclosure, an objective standard with due regard to the patient's information needs and the physician's situation must be considered. "A risk is thus material when a reasonable person ... would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." *Id.* at 787.

*Bean, supra* at 575.

The Court in *Bean* concluded that the registration form executed by Mrs. Bean advised her of possible severe or potentially fatal reaction to the inoculation. The Court concluded that the inclusion of potential neurologic disorders resulting from the vaccine would not be significant. "A reasonable person, when informed that a treatment might lead to fatality, would not require advice concerning potential neurologic disorders in order to make an informed consent." *Bean, supra* at 576.

The holding in *Bean* was relied on by the Court in *Gundy v. United States*, 79–F–587 (D.C.Colo., Sept. 9, 1980). The Court in *Gundy*, at 15, held:

> The warning given to plaintiff was sufficient to provide her with adequate information to make an informed decision as to whether she should be vaccinated. The inclusion in the warning of potential neurologic disorders, in light of the warning of potential fatal reactions, would not have been meaningful.... We ... find and conclude that the warning she received was adequate to inform her of the risks involved in being vaccinated.

This Court does not so conclude. (The registration form in *Gundy* was the same as

---

**7.** In *Canterbury*, plaintiff was a patient of defendant doctor. Plaintiff brought suit alleging defendant doctor was negligent in failing to disclose a risk of serious disability inherent in an operation performed by defendant on plaintiff. The Court of Appeals reversed the District Court's directed verdict in favor of defendant and held the evidence presented a jury issue as to the sufficiency of the warning. Unlike the

matter before this Court, the Government was not involved in *Canterbury*.

**8.** This statement from *Canterbury* is recognized by this Court as good law. However, the Court is of the opinion that the communication made to plaintiff in this matter was unreasonably inadequate.

the one in *Bean* and as the one involved in this matter.)

At trial, there was considerable deposition testimony on the consent form introduced into evidence by the parties. Among this testimony was that of Dr. Jonas Salk. Dr. Salk, along with most of the doctors testifying in this matter, had impressive credentials and had spent his entire professional career in the area of preventive medicine. Dr. Salk testified concerning the swine flu inoculation and the need to disclose any dangers of the inoculation. At page 97 of his deposition, Dr. Salk was asked the following question:

Q. We were talking about the information or the education necessary in this type of volunteer program. To use an example, Doctor, if you're using the live polio vaccine, the oral vaccine, *wouldn't it be fair to tell the American people of the inherent risks in that vaccine as part of the educational effort.* I know you don't advocate the use of it, but—

A. *Well, I think it's imperative, not a matter of being fair. It's immoral, unethical not to do so,* .... (Emphasis added.)

Dr. Salk also testified:

A. If I were a policymaker, I would make every effort to inform the individuals who were involved with all of the known facts and to whatever extent the advantages and the disadvantages, the probabilities of acting or not acting, and I'd do that as fully as I would go to a colleague and I would do that because a certain segment of the population is capable of handling that, *the rest of the population is not capable of handling that, will act on the basis of advice or recommendations or opinions of others,* and so by adhering to the principle of full disclosure and telling the whole truth in as unbiased a way as possible that one is making available

the knowledge, information, understanding on the basis of which people can then make a choice. (Emphasis supplied.)

Also at trial, the deposition of Michael A. W. Hattwick was read into evidence by the parties. Dr. Hattwick testified concerning the registration form. Dr. Hattwick contributed to the program by providing certain input into the committee responsible for drafting the consent form involved in this matter. In his deposition, Dr. Hattwick stated that he had certain knowledge that one of the problems associated with vaccinations or immunizations was certain neurological disorders. Dr. Hattwick, at page 211 of his deposition, states: "We expected neurological complications and they did occur and that was not a surprise." These neurological complications were occurrences of the Guillain-Barre syndrome. Dr. Hattwick testified that these were occurring more frequently than were expected. *Id.* At page 240, Dr. Hattwick stated:

The issue as I see it is certainly we knew that neurologic and anaphylaxis reactions were associated with influenza vaccine. It was in the PDR.[9] It was in the Assessment Manual as it should have been.

Now the next question is what should have been the phrase that was put on the consent form and talked about. I don't have strong feelings that neurologic and anaphylaxis, those words, should have been put on those forms because I think they could have been confusing to people. That decision was not made by me.

Q. Okay. But when you say "could have been confusing", aren't you really saying, and correct me if I am wrong, that this confusion would have prevented people, or caused people not to get the vaccination because they would have had a fear that they would have had a neurological complication?

---

9. PDR stands for Physician Desk Reference. The PDR is a catalog of all the various drugs, containing warnings, contraindications and indications of the drugs. *See* Hattwick depo. at 172.

A. Yes.

*Id.* at 240–41.

At page 281;

Q. From your point of view what was the purpose of the form, what was your understanding of the purpose?

A. As far as my understanding it was a legal requirement in order to demonstrate that we had provided informed consent....

Q. What was the purpose of this registration form that people were to read before they got a shot?

A. To inform them of the risks and benefits of the vaccination.... The primary purpose of the program was to make it available as *it was to the opinion of the people who were running the program that the people should take it.* It was in their best interests....

Q. So, any decisions that were made as to what to put on or off the consent form were decisions that were made—

A. *To encourage participation.* (Emphasis supplied.)

Also testifying at trial by deposition was Dr. Jay Katz. Dr. Katz was also involved in the preparation of the informed consent form and had studied in the field of consent. At page 15 of his deposition Dr. Katz was asked the following question:

Q. In connection with the swine flu program, persons who appeared at the vaccination centers were given a—I will ask you to explain this—the people were given information forms. Was this the best time to provide this sort of information to the people?

A. No. It is not the best time. If it had been done well before there is no harm in giving them the information at that point also. But it is least helpful to persons—in fact maybe at times almost useless for people to receive the information at that moment in time.

Also at pp. 32–33 Dr. Katz was asked the following questions:

Q. I would like to ask you with respect to the registration form, at the bottom of that page there is a statement that says, "I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination." In your opinion would someone reading the preceding information at the top of the page have a clear understanding of the benefits and risks of vaccination?

A. No, they would not have. *The signature is meaningless.* (Emphasis supplied.) [9A]

With regard to the standard of care required in informing one of the risks involved in treatment (or vaccination), Prosser states as follows:

> The factors to be considered (as to what disclosure should be made) include the likelihood and seriousness of the bad result, the feasibility or alternative methods, the interest of the patient, knowledge of his past history, his emotional stability, the necessity of treatment, and the existence of an emergency.

Prosser, *Law of Torts*, pp. 165–166 (4th ed. 1971).

Advising one of each of the above factors would truly inform one of the risks involved and any consent thereafter would be an "informed consent."

Iowa provides by statute for the contents of a consent form. Iowa Code (1979) § 147.137 provides:

147.137 Consent in writing

---

[9A] In MDL Document 153 (Exhibit 14 here), the Maryland Health Department by letter informed Dr. Millar (see Stipulation of Fact No. 40), "We have never wanted to 'scare' people; however for truly informed consent the scary stuff as well as the pleasant benefits must be clearly explained. This form is more promotional than informative." The Court recognizes that the draft attached to Exhibit 14 was not the final draft.

A consent in writing to any medical or surgical procedure or course of procedures in patient care which meets the requirements of this section shall create a presumption that informed consent was given. A consent in writing meets the requirements of this section if it:

1. Sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure or procedures, with the probability of each such risk if reasonably determinable.

2. Acknowledges that the disclosure of that information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner.

3. Is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, is signed by a person who has legal authority to consent on behalf of that patient in those circumstances.[10]

With all of the above evidence before this Court, it is now necessary for the Court to determine whether or not the Government met the statutory standard of "development and implementation of a written consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered." 42 U.S.C. § 247b(j)(1)(F). The Court concludes the Government failed to meet this statutory standard and therefore was negligent in failing to adequately warn plaintiff of the dangers involved in the swine flu vaccination.

In reaching this conclusion the Court has considered all of the evidence and circumstances involved with the swine flu program. First, the Court is of the opinion President Ford had the right and sufficient medical information to make the decision to go forward with the Swine Flu Program and properly did so.

Next, the Court recognizes the difficulty the Government had in drafting the consent form. (There is evidence that "drafts of it changed every week.") *See* Hattwick depo., p. 464. However, because of the clear mandate of the legislation and because of the "hard sell" campaign[11] by the Government to sell the American public on the need for swine flu vaccination, the widespread disagreement between medical scholars as to the actual need of the swine flu program, the prior knowledge by the Government of certain neurological complications arising from the vaccination,[12] and disagreement as to the content of the consent form,[13] a full, adequate and understandable warning[14] of the risks and bene-

---

10. There are no annotations in the Iowa Code under this section as it is relatively new (1975). Further, although "consent" is mentioned in the first sentence, there are no indications or guidelines in ¶ 3 as to what form the "consent" should be and whether or not the words "Registration Form" would be adequate. This Court thinks not.

11. Part of this "hard sell" campaign was President Ford appearing on television while he received the swine flu vaccination. Further, in deciding to go ahead with the swine flu program, President Ford requested Congress to appropriate money so that "every man, woman and child" could be vaccinated against swine flu. Multidistrict Stipulation of Facts, ¶ 171. Dr. Modell testified in his deposition at page 41 that certain statements were "an attempt to sell ... rather than give a non-prejudiced presentation of the facts, there was an attempt to convince the reader that he ought to take the

shot." *See* also plaintiff's Exhibits 23 and 25 and Dr. Millar's strong statement here in Sioux City, Exhibit 20.

12. Several medical experts testified that they expected neurological reactions from the swine flu vaccine. Dr. Hattwick at page 189 of his deposition agreed that he expected certain "neurological and anaphylactic reactions." *See also* p. 209 of Hattwick's deposition.

13. It was partially conceded by the United States Attorney in closing arguments that politics got into the making of the "consent" form and the evidence shows that proposed drafts changed every week and in final form it was called a "Registration Form."

14. Dr. Millar testified in his deposition at page 87 that "public opinion surveys suggested that over ninety percent of the people who received

fits, and rights and remedies, was imperative. It was not given.[15]

The Court is not criticizing the Government for its "hard sell" tactics in promoting the swine flu program. Such a program, in the eyes of the Government, was best for the health and welfare of the public. However, because of the "hard sell" campaign, the Government has a responsibility to protect and help those citizens who volunteer for the vaccination and subsequently become ill as a result thereof. The Government should not hide behind the four corners of a complicated registration form (now argued to be a consent form) and thereby deny and avoid liability.

By analogy, if the president of a drug firm came to a doctor's office and encouraged an undecided participant to take the vaccine and then capped off that sales pitch by taking a shot himself, it certainly could be considered in later determining if there had been an "informed consent." The fact that the Government had a "hard sell" campaign in promoting the swine flu vaccination has been considered by the Court as one of the factors in determining whether or not there was "informed consent." The Court concludes there was not.[16]

It may well be argued (and probably will be) that the Government should not nurse the American public from cradle to grave. This Court subscribes to the conservative viewpoint of such an argument. However, the plaintiff herein asked for nothing prior to his vaccination. The evidence shows he was a hard-working, healthy taxpayer who was sold in a patriotic way to take the swine flu vaccine, thereby preventing the spread of swine flu and saving himself. When asked, plaintiff responded to the call of his country. The Government should not now look lightly on plaintiff and his illness. The Government should aid the plaintiff in making himself "whole" again by paying a money judgment.

In summary, the Court finds that there was no satisfactory "informed consent form" setting out "rights and remedies" as required by the legislation, and further finds that even if the "Registration Form" is considered by this Court as adequate to inform as to the "rights and remedies" of a participant, it is inadequate in setting out the "risks and benefits" also required by the legislation.

The Court concludes defendant failed to meet the statutory standard of 42 U.S.C. § 247b(j)(1)(F) and therefore was negligent in failing to adequately warn plaintiff of the dangers involved in the swine flu vacci-

---

the form felt they understood it." If the above is true, what about the ten percent who did not understand the form? To the extent possible, the form should be understood by all who read it. Mr. Petty said he understood the form to mean persons allergic to eggs might experience a mild reaction or a sore arm, but that is all. Clearly, plaintiff did not understand the seriousness of the vaccination.

**15.** The Government alleges as a defense to its failure to adequately warn plaintiff of the "risks and benefits" and "rights and remedies" in taking the swine flu vaccine, that such a decision was discretionary, and falls within the exception to jurisdiction of this Court set forth in 28 U.S.C. § 2680(a). Although the Court recognizes that drafting the Registration Form (now argued as a consent form) required some judgment and discretion concerning what to include or exclude, it is negligence to ignore the guidelines established by the legislation. The Government was directed to advise the American public of their "rights and remedies" and "risks and benefits" associated with the swine

flu vaccine. This was not done and therefore the Government was negligent in this regard.

**16.** In the matter before the Court, the Government stands in the shoes of the manufacturer of the swine flu vaccine. Because the Court has concluded that the warning accompanying the swine flu vaccine was not adequate, the Government cannot avoid liability for plaintiff's damages. The Government was negligent in not fully informing plaintiff of the risks and benefits and rights and remedies in receiving the swine flu vaccine. If the Government had adequately warned plaintiff, it then, like a manufacturer of a dangerous drug, could have avoided liability since the marketing and use of the swine flu vaccine would have been fully justified. Without a proper warning, the swine flu vaccination was not justified. The Court did not have access to the early drafts of the "informed consent form" which are mentioned in the final pre-trial order, Exhibit 3, page 38, in answer to interrogatory No. 90.

nation.[16A] All other causes of action against defendant are dismissed. All motions for directed verdict are denied. All motions in limine are overruled.

## CAUSATION

■ Having now found that plaintiff was not adequately warned of the dangers in receiving the swine flu vaccine, the Court next considers whether or not defendant's failure to adequately warn plaintiff of the dangers involved in receiving the swine flu vaccine was the cause of the damages suffered by plaintiff. In this regard, the question must be answered whether or not the swine flu vaccination caused the illness which plaintiff suffered. Plaintiff has the burden of proving by a preponderance of the evidence that the swine flu vaccine was the proximate cause of his injuries.

In meeting this burden of proof, the plaintiff called Dr. Hyden to testify at trial. Dr. Hyden was plaintiff's personal physician who had attended to plaintiff throughout his illness. Dr. Hyden is an internal medicine specialist with excellent credentials, training and wide experience. At trial, Dr. Hyden testified that in his medical opinion the swine flu shot caused plaintiff's severe serum sickness, which in turn caused plaintiff's congestive heart failure. Dr. Hyden testified that the vaccine was a foreign protein which caused an immune complex to form, setting up an antibody-antigen reaction, which created an inflammatory condition throughout the body. Dr. Hyden testified that there was no evidence that plaintiff received any other foreign protein besides the swine flu vaccine.

The defendant did not call to testify at trial a medical expert to refute or contradict the testimony of Dr. Hyden. The defendant did present medical testimony by way of deposition concerning the issue of causation. However, it is this Court's opinion that most of this medical testimony related to Gulliane-Barre syndrome, and not

serum sickness. The Government failed to call a medical expert to the stand who specialized in diagnosis and treatment of plaintiff's particular type of illness, serum sickness. Furthermore, the Government failed to present an expert who had studied plaintiff's particular case, reviewed the hospital and medical reports, read the depositions and testimony of plaintiff's medical expert, and could testify concerning his opinion as to the cause of plaintiff's illness.

The Court notes that at trial respected physicians rendered opinions to a reasonable degree of medical certainty that would lead to contrary results. The Court has endeavored to determine those opinions which represent the more probable state of events and the relative weight to be given each. The Court respects the credentials and backgrounds and experiences of the medical doctors who testified in this case. However, as the factfinder, the Court has endeavored to consider those opinions which represent the more probable state of events as being somewhat pivotal. The Court is of the opinion that because Dr. Hyden was plaintiff's personal physician and examined plaintiff throughout the relevant times involved in this matter, that his testimony is the more convincing in this matter. This conclusion is further supported by the fact that there was no contrary medical testimony presented at trial. The Court is persuaded that plaintiff has met his burden of proof. The more persuasive evidence leads the Court to believe that the neurological disorder suffered by plaintiff was caused by the swine flu inoculation.[16B]

The Court therefore concludes that plaintiff's severe serum sickness and disability resulting therefrom were caused by the swine flu vaccination of October 31, 1976. Defendant is liable to plaintiff for whatever damage plaintiff has sustained as a result of being inoculated with the swine flu vaccine.

---

**16A.** This finding is based on the allegations of Count I of plaintiff's complaint.

**16B.** *See also* Dr. Hattwick's deposition, pp. 189, 193, 209, 210, 211, 430, 431, 459, 482; Dr. Restak's deposition, pp. 47, 48; Dr. Poser's deposition, pp. 29, 30.

## DAMAGES

The parties have stipulated to certain of the damages suffered by plaintiff. The parties agree that the fair and reasonable costs of plaintiff's hospital, medical and prescription services amounted to $9,827.82. The parties also agree that plaintiff lost $9,576.48 in lost wages while completely off work from November 9, 1976 through March 29, 1977. The parties also agree that plaintiff has lost $774.00 in lost wages due to followup medical care. These stipulated amounts total $20,178.30.

The parties agreed that the hourly union scale received by plaintiff for regular work when he became ill was $10.96 and this was raised to $12.52 on June 1, 1977 to $12.87 on June 1, 1978, and $13.47 on June 1, 1979.

The evidence shows that after March 29, 1977, the plaintiff was able to do only 50 percent as much work during the first two and a half months, 70 percent as much during the next five months, and thereafter has been able to do only 75 percent to 80 percent as much work when compared with his normal working ability prior to his illness. Although there was evidence plaintiff could not perform his job at 100 percent once he returned to work in late March 1977, there was no evidence that plaintiff was not paid the going rate for 40 hours of work each week. For that reason plaintiff shall not be awarded any damages for lost wages from late March 1977 until the date of trial.

There was evidence at trial that "high time" [17] became available in April 1977 and that plaintiff would have undertaken this high time work had it not been for his illness and disability. High time is paid at double the rate of regular time for work above 80 feet and one and a half times the regular rate above 40 feet. Had plaintiff been healthy, he would have undertaken this high time work. However, because of his illness and less than full capabilities, plaintiff did not perform any high time work subsequent to his illness.

The parties agreed that in 1975 plaintiff earned $2,338.54 in overtime and high time and in 1976 (ten months through November 8), plaintiff had earned $795.87 on overtime and high time. This averages out to $142.84 per month. Therefore, the Court concludes plaintiff is entitled to an award of $5,428.92. This represents 38 months (from late March 1977 until the date of trial in June 1980) of lost overtime and high time due to plaintiff's illness.[18]

In summary, the Court finds plaintiff has suffered $25,607.22 in total special damages computed up to the time of trial.

In considering general damages, the Court reviews certain of the evidence presented at trial. At the time plaintiff received the swine flu shot, he was 33 years of age. He had enjoyed excellent health with no physical infirmities. Extensive evidence was presented at trial which established plaintiff as being a very recreational oriented individual who participated in many outdoor sports.[19] Furthermore, plaintiff's type of job required much strength and agility, especially while engaged in high time employment.

After receiving the swine flu vaccination, plaintiff's life style changed drastically. He was hospitalized for almost a month and then had to remain at home almost four more months before he could return even to light work. He has had difficulty performing even light work ever since, and is so exhausted at the end of the regular work day that he is unable to take part in recreational and family activities which formerly were such an important part of his life. He is irritable and depressed by his continuing aches, pains, fatigue, inability to do things which he could easily do before and unac-

17. High time is a term used to define electricians' work performed above a certain number of feet where there is a possibility of falling and incurring bodily injury.

18. The $5,428.92 figure represents lost amounts for both high time and overtime. The work is available only intermittently and therefore an average over 22 months seems appropriate.

19. Exhibits 7, 8, 9, 10, 11 and 12 are pictures of plaintiff participating in recreational activities prior to his illness. These support the fact that plaintiff was very active prior to his illness.

customed dependence on others. He also has emotional problems which are a residual from his acute illness.[20] All of these conditions contribute to plaintiff's being too tired in the evenings and weekends to fully enjoy life as he once had.

There was also solid evidence presented at trial which established great pain and suffering by plaintiff. Throughout his hospitalization plaintiff experienced great pain and suffering and in fact was on the verge of death during certain periods of his stay in the hospital. At one point plaintiff even stated that he could no longer endure the pain and felt he would be better off if he just died. At trial he testified that the pain has never left him completely at any time since he first began to experience it on November 8, 1976. Plaintiff's personal physician, Dr. Hyden, confirmed that plaintiff has never been completely free of symptoms of aching and pain since plaintiff first came under his care. Plaintiff testified that his hands and knees were aching throughout the trial and that these pains are consistent throughout the day and evening periods.

Dr. Hyden testified at trial that he last saw plaintiff on May 15, 1980 and at that time he gave plaintiff a complete physical. Dr. Hyden testified that the pains experienced by the plaintiff are very real pains. The doctor, however, could not conclude that the injury and continuing pains suffered by the plaintiff would be permanent.

The life expectancy on the date of trial of plaintiff was 34.88 years. The Court is of the opinion that plaintiff should not be awarded damages to compensate him throughout the remainder of his full life expectancy. The Court so concludes because Dr. Hyden, who had examined plaintiff immediately prior to trial, was unable to determine whether or not the pains that plaintiff was experiencing would continue throughout plaintiff's life expectancy. However, because plaintiff's pain and suffering are real, the Court does believe that plaintiff should be awarded general damages to compensate plaintiff for 17.44 years, which is half of his life expectancy. Accordingly, the Court finds that plaintiff should recover additional general damages in the amount of $87,200.00.[21] Furthermore, the Court believes that plaintiff should recover general damages in the amount of $100,000.00 for his pain and suffering from the onset of his illness to the date of trial, which is approximately three years and seven months.[22]

For all the foregoing reasons,

20. A friend of plaintiffs testified at trial that plaintiff looked like "death warmed over". Plaintiff's appearance at trial supported this testimony since he did not look well even at the date of trial, some 43 months after the inoculation.

21. Because of plaintiff's current symptoms of pain and suffering are subjective, the Court cannot accept these as permanent. However, Dr. Hyden did testify that these pains were "real". This medical testimony supports the Court's finding as set out above. See Kaltenheuser v. Sesker, 255 Iowa 110, 121 N.W.2d 672 (1963), which held future pain and suffering may be inferred by the type of injury suffered by plaintiff. Subjective symptoms must be supported by some medical testimony.

The $87,200.00 is based on $5,000.00 per year for 17.44 years, one-half of plaintiff's life expectancy. Further, this award for future pain and suffering shall not be reduced to present value. See Flanigan v. Burlington Northern, Inc., 632 F.2d 880 (1980, 8th Cir.).

22. The award of damages shall not be reduced by the amount paid by Blue Cross and Blue Shield. Iowa's collateral source rule precludes such a reduction. See Allen v. Barrett, et al., 100 Iowa 16, 69 N.W. 272 (1896); Caliqiuri v. Des Moines Ry. Co., 227 Iowa 466, 288 N.W. 702 (1959). The Court also awards no damages to plaintiff for trips made by Mrs. Petty to visit her husband while in the hospital. These trips were certainly necessary, but are not, in the Court's opinion, a proper measure of damages. The Court reserved ruling on certain matters at trial. After fully considering the objections made, the Court overrules plaintiff's motion to strike testimony concerning the fact different vaccines were used in certain areas. These vaccines were not significantly different from the vaccine involved herein, and therefore plaintiff's motion to strike is overruled. The Court did not consider Exhibit 18 of Dr. Bellanti's, and therefore the objections thereto are sustained, and the Court did not consider Exhibits 31A, B, C, D, and E and therefore the objections thereto are sustained.

IT IS HEREBY ORDERED that judgment be entered in favor of plaintiff in the amount of $212,807.22, with interest and costs of this action as provided by law.

## APPENDIX A

### IMPORTANT INFORMATION
### ABOUT SWINE INFLUENZA (FLU) VACCINE
### (MONOVALENT)

July 15, 1976

The Disease

Influenza (flu) is caused by viruses. When people get flu they may have fever, chills, headache, dry cough or muscle aches. Illness may last several days or a week or more, and complete recovery is usual. However, complications may lead to pneumonia or death in some people. For the elderly and people with diabetes or heart, lung, or kidney diseases, flu may be especially serious.

It is unlikely that you have adequate natural protection against swine flu, since it has not caused widespread human outbreaks in 45 years.

The Vaccine

(Above the dashed line is trial Exhibit C.) The vaccine will not give you flu because it is made from killed viruses. Today's flu vaccines cause fewer side effects than those used in the past. In contrast with some other vaccines, flu vaccine can be taken safely during pregnancy.

One shot will protect most people from swine flu during the next flu season; however, either a second shot or a different dosage may be required for persons under age 25. If you are under 25 and a notice regarding such information is not attached, this information will be provided to you wherever you receive the vaccine.

Possible Vaccine Side Effects

Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache, or muscle aches within the first 48 hours.

Special Precautions

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

- Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.
- People with known allergy to eggs should receive the vaccine only under special medical supervision.
- People with fever should delay getting vaccinated until the fever is gone.
- People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

*If you have any questions about flu or flu vaccine, please ask.*

REGISTRATION FORM

(Below the dashed line is trial Exhibit B.) *I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian.*

| INFORMATION ON PERSON TO RECEIVE VACCINE | | FOR CLINIC USE |
|---|---|---|
| Name (Please Print) | Birthdate    Age | |
| Address | County of Residence | Clinic Ident. |
| | | Date Vaccinated |
| | | Manufacturer and Lot No. |

_____   _____
Signature of person to receive        Date
vaccine or Parent
or Guardian

CDC 7.31
7.76       U.S. Department of Health, Education, and Welfare/Public Health Service/Center for Disease
Control/Atlanta, Georgia 30333