**Emma GASSMAN and Julius Gassman, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 79–314–Orl–Civ–06.**

United States District Court, M.D. Florida, Orlando Division.

June 27, 1984.

Christopher Wickersham, Daytona Beach, Fla., for plaintiff.

Gary Takacs, Asst. U.S. Atty., Tampa, Fla., for defendant.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Senior District Judge.

Plaintiff Emma Gassman brings this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, in connection with the National Swine Flu Immunization Program Act [hereinafter "Swine Flu Act"], 42 U.S.C. § 247b(j)–(1), seeking compensation for injuries allegedly resulting from her receipt of a swine flu innoculation. This action was filed on June 25, 1979, transferred as multi-district litigation to the District of Columbia for consoli-

dated pretrial proceedings,[1] and remanded to this Court by an order dated November 3, 1980. A bench trial on the merits was held on October 11 and 12, 1983.

Mrs. Gassman contends that the swine flu vaccination caused her to develop inflammatory encephalitis and that the United States is liable for failure to obtain her informed consent in administering the vaccine.[2] The United States opposes Mrs. Gassman's claim, contending that there was no causal relation between the vaccination and Mrs. Gassman's condition, and that Mrs. Gassman has not established a theory of recovery which would render the government liable. The Court has fully considered the evidence and arguments of the parties and files this opinion which incorporates the Court's Findings of Fact and Conclusions of Law. For the reasons stated herein, the Court concludes that plaintiff's encephalitis was the proximate result of her swine flu inoculation and that she is entitled to compensation from the government.

### 1. *Swine Flu Program*

The Swine Flu Act of 1976 was a governmentally-undertaken attempt to innoculate the entire United States population, prompted by the discovery at Fort Dix, New Jersey of individuals having influenza of the "swine" type and the resulting concern that an epidemic would occur. Congress enacted implementing legislation on August 12, 1976, and vaccinations began on October 1, 1976. The program was discontinued on December 16, 1976, following reports linking the vaccine to the incidence of Guillain-Barre Syndrome, a disorder of the peripheral nervous system. In all, over forty-five million Americans were vaccinated for swine flu.

To ensure the success of the program, the Act created a cause of action against the United States for any personal injury or death arising out of the administration of the swine flu vaccine and based upon the act or omission of a program participant. 42 U.S.C. § 247b(k)(2)(A). This cause of action would be the exclusive remedy, 42 U.S.C. § 247b(k)(3), and would be governed by the procedures of the Federal Tort Claims Act. 42 U.S.C. § 247b(k)(1)(B). Liability could be based on any theory that would otherwise govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability or breach of warranty. 42 U.S.C. § 247b(k)(2)(A)(i). The term "program participant" was defined to include anyone who manufactured, distributed or administered the swine flu vaccine. 42 U.S.C. § 247b(k)(2)(B).

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–77.[3] As one might expect, many people who were innoculated incurred illness or injury in a period relative to the vaccination. Lawsuits such as the instant one were filed throughout the country for illnesses allegedly resulting from the swine flu program.

### 2. *Facts*

On Friday, November 5, 1976, plaintiff received a swine flu innoculation[4] at the

---

1. *See* Final Pretrial Order, *In Re: Swine Flu Products Liability Litigation,* M.D.L. No. 330, Misc. No. 78–0040 (D.D.C. Nov. 15, 1979).

2. Plaintiff conceded at trial that the claim of her husband should be dismissed for failure to exhaust administrative remedies, and that her claim for damages is limited to $100,000.00.

3. After the outbreak at Ft. Dix, only six isolated cases of swine flu were reported in the United States during 1976 and 1977, and these each apparently resulted from contact with swine rather than from human transmission. Stipulation of Facts, paragraphs 143–144; Walter R. Dowdle, Ph.D., M.D.L. Deposition, PP. 93–94; Albert B. Sabin, M.D., M.D.L. Deposition, PP.

31–32. However, epidemics of influenza due to the more virulent "A Victoria" virus did occur in the spring of 1976 and the following winter. To enable high-risk individuals to be vaccinated against this latter virus, the Swine Flu Program was resumed on a limited basis in February 1977. Recipients were given a bivalent vaccine (for both swine flu and A Victoria flu) apparently because at the time the A Victoria Flu vaccine was only available in that form. *See* Sidney M. Wolfe, M.D., M.D.L. Deposition, P. 39.

4. The vaccine plaintiff received was "Influenza Virus Vaccine Monovalent, Type A 200 CCA units/0.5 ml dose of A/New Jersey/8/76 (HswlNl) prototype virus strain", and was manufactured by Wyeth Laboratories.

Naval Reserve Training Center on City Island in Daytona Beach, Florida. The vaccination was administered by the Volusia County Health Department, a program participant under the Swine Flu Act.

At the time she took the vaccine, plaintiff appeared to be in relatively good health. She was 59 years old and was employed as a secretary/receptionist for an insurance agency. Her family physician, Dr. Edward Favis, had diagnosed her as hypertensive in January or February, 1976, and thereafter prescribed Hygroton and a mild dose of Valium. Mrs. Gassman had complained of occasional headaches, which abated once she was placed on the hypertension medication. During the two or three months preceding her vaccination, plaintiff experienced some intermittent numbness in the right upper and right lower extremities, which occasionally lasted a few hours and then cleared. She testified, however, that she did not recall any numbness during the period just before her innoculation, and that on the day she was vaccinated she "never felt better".

Prior to her vaccination, plaintiff had seen and heard television and newspaper advertisements which indicated there was a good possibility of a swine flu epidemic throughout the United States and that everyone should be vaccinated against it. Mrs. Gassman initially hesitated in taking the vaccine due to concerns about its safety. She decided to take it, however, because of media assurances—including a

television statement by President Ford—that the shot was safe and "approved" and that "everyone should have it". Plaintiff also questioned two of her co-workers who had received the vaccine, each of whom told her they "felt fine".

Mrs. Gassman was accompanied by her husband and son when she went to the vaccination clinic on November 5, 1976. Shortly after arriving, plaintiff was handed a form which she was instructed to fill out. It was unclear from the evidence exactly which form she received. Plaintiff contends that she was given a form entitled "IMPORTANT INFORMATION ABOUT THE SWINE INFLUENZA (FLU) VACCINE (MONOVALENT)", which is reproduced in Appendix "A" to this opinion. (Plaintiff's Exhibit No. 4; M.D.L. Doc # 473). This is the form she should have been given, since she was innoculated with the Monovalent vaccine. (*See* Deposition of Muriel Edith Treen, PP. 22–25).[5] On the other hand, the "REGISTRATION FORM" which plaintiff filled out and signed was the bottom half of a form entitled "IMPORTANT INFORMATION ABOUT SWINE AND VICTORIA INFLUENZA (FLU) VACCINE (BIVALENT)",[6] which is reproduced in Appendix "B". (Defendant's Exhibit Nos. 2, 5; M.D.L. Doc. # 460). The Court finds these two forms to be identical in the respects which are material to this case.[7]

---

**5.** Ms. Treen, a nurse with the Volusia County Health Department who supervised in setting up the vaccine clinic where plaintiff was innoculated, testified that recipients were classified such that they were given the bivalent vaccine only if they were at least 65 years of age or "high risk" individuals (i.e., chronically ill or under a physician's order); otherwise they were given the monovalent vaccine. Ms. Treen testified that in accordance with this procedure Mrs. Gassman would have received the monovalent vaccine. *Cf., Bean v. United States,* 533 F.Supp. 567, 573–74 (D.Colo.1980) (evidence of county health department's habit or routine practice may establish treatment given to plaintiff). Furthermore, Mrs. Gassman testified that after filling out their forms, she and her son stood in one line to receive their shots, but her husband, who was 63 and had a heart condition, was placed in another line across the room. This is signifi-

cant because the clinic was divided into two lines, one for recipients of the monovalent vaccine and one for recipients of the bivalent vaccine. (Defendant's Exhibit No. 1; Treen, Deposition, PP. 9–12).

**6.** It is possible that Mrs. Gassman and her husband got their forms mixed up as they filled them out, or that clinic personnel gave Mrs. Gassman a detached monovalent information form with a bivalent registration form. In any event, the government apparently does not dispute that plaintiff received a monovalent information form prior to her swine flu vaccination. (*See* Defendant's Post Trial Brief at paragraphs 113–114, filed November 18, 1983).

**7.** Neither party has raised an issue of any alleged discrepancy between the two forms.

After receiving the form, Mrs. Gassman sat at a table and printed her name, address, etc. in the spaces provided and signed the form. Plaintiff testified that she did not remember much about the contents of the form because she "wasn't taking particular notice of it at the time". Plaintiff then returned the completed form and stood in line to receive her shot. The only question plaintiff remembered being asked by clinic personnel was whether she was allergic to eggs.

On Sunday, November 7, 1976, approximately two days after her innoculation, plaintiff developed aches and pains in her upper thighs. Believing these pains were merely *temporary after-effects of the* swine flu shot, plaintiff did not contact her physician and returned to work the following morning. The pains, however, increased each day during that week.

On Saturday, November 13, 1976, Mrs. Gassman experienced a sudden onset of difficulty in speaking. She intermittently could not make her mouth form words and what she said came out slurred. In addition, she began feeling weakness in both her upper and lower right extremities. At work the following Monday, Mrs. Gassman found she was unable to write memos clearly and had difficulty speaking while answering the phone. At times she suffered from blurred vision and had occasional lapses of memory. She also began to require more sleep than normal.

On the morning of November 19, 1976, after consulting with Dr. Favis' office, Mrs. Gassman went to Halifax Hospital in Daytona Beach for testing. Later that day, Dr. Favis informed her that based on the test results he felt she had suffered a stroke [8], and advised her to go immediately to Ormond Beach Memorial Hospital where she was to see Dr. Kenneth Derbenwick, a neurologist. After Mrs. Gassman's admission to Ormond Beach Memorial Hospital, Dr. Derbenwick conducted several neurological tests. His positive findings included mild to moderate right hemiparesis of approximately equal degree in the right arm and leg, mild right lower facial weakness, spasticity and weakness in the right lower extremity, and marked reduction of rapid coordinative movements on the right side with mild to moderate reduction on the left. Based on these findings, Dr. Derbenwick's initial impression was that Mrs. Gassman had suffered a left cerebral infarction following apparently several spells of left cerebral transient ischemic attacks. However, a subsequent analysis of the plaintiff's cerebrospinal fluid revealed abnormally high levels of protein and white blood cells. Numerous subsequent tests were performed, the results of which led Dr. Derbenwick to conclude that Mrs. Gassman was inflicted with postvaccinal encephalitis resulting from the swine flu innoculation. Dr. Derbenwick's summary diagnosis upon plaintiff's discharge from Ormond Beach Memorial Hospital on November 29, 1976 was "probable viral encephalitis, probably with secondary transient cerebral ischemic episodes."

After being discharged, plaintiff was confined to her bed for approximately one month, and had difficulty walking alone for approximately two months. Plaintiff continued to suffer from weakness in her right extremities and pain in her upper legs. An electromyography examination performed in February, 1977 led Dr. Derbenwick to conclude that the lower extremity pains were caused by a viral-related generalized polyradiculopathy, an inflammation of multiple nerve roots. Plaintiff was thereafter treated for a month with steroid medication, which was somewhat effective in reducing her pains.

Because Mrs. Gassman's leg pains did not fully resolve, Dr. Derbenwick conducted further evaluations in July, 1977. He concluded that plaintiff's complaints at that time were probably due mainly to an intervening degenerative lombard disc disease

---

**8.** Dr. Favis' impressions were based on the results of an electroencephalogram performed on Mrs. Gassman at Halifax Hospital by Dr. G. Gilbert Tweed, a neurologist. In his consultation report, Dr. Tweed interpreted the tests as reflecting "abnormal EEG consistent with a disfunctioning and/or destructive lesion involving predominantly the left frontal and/or temporal regions. The etiology of these changes cannot be determined on the basis of the EEG alone."

which was unrelated to the swine flu vaccine. Dr. Derbenwick expressed the opinion that plaintiff's polyradiculopathy may well have been resolved at that time. During subsequent examinations in March and May, 1980, however, Dr. Derbenwick noted that Mrs. Gassman continued to suffer a variety of mild residual symptoms due to her encephalitis, including some slowness of thought, a variable facial droop, weakness in her right extremities, and generalized fatigue.

### 3. Causation

■ The threshold factual question facing the Court is whether plaintiff's injuries were proximately caused by the swine flu vaccine. Under applicable Florida law, plaintiff has the burden of proving by a preponderance of the evidence that the vaccination was a substantial factor in the onset of her injuries. *Hockett v. United States*, 730 F.2d 709 at 712, (11th Cir.1984); *See Gooding v. University Hospital Building, Inc.*, 445 So.2d 1015, 1018 (Fla. 1984).

### a. *Expert Testimony*

The evidence presented on the question of causation consisted primarily of the testimony of two expert witnesses: Dr. Kenneth P. Derbenwick and Dr. Peter Benjamin Dunne.

As set out above, Dr. Derbenwick was the neurologist who treated Mrs. Gassman following her swine flu innoculation. In accordance with his final diagnosis, Dr. Derbenwick testified that Mrs. Gassman contracted viral or postvaccinal encephalitis as a result of the vaccination. He indicated that he held this opinion with reasonable medical certainty. Dr. Derbenwick arrived at this final diagnosis through a process of induction consisting essentially of two broad steps: first, he conducted a series of examinations and tests which ruled out, or failed to indicate, other potential explanations for Mrs. Gassman's symptoms; and second, he noted a variety of factors which pointed to the swine flu injection as the probable cause of her neurological disorder.

Samples of plaintiff's cerebrospinal fluid (CSF), were extracted on November 19, 1976 and again on November 27, 1976. Analysis of these samples revealed levels of protein and white blood cells, predominantly lymphocytes, which were abnormally high and inconsistent with a purely vascular explanation of Mrs. Gassman's symptoms. Further CSF and blood tests demonstrated that the high lymphocyte count was not due to bacterial, fungal or tuberculous meningitis, and thus favored a diagnosis of viral or postvaccinal encephalitis.

CSF and blood samples were then sent to the laboratory of the Florida Department of Health and Rehabilitative Services to determine whether plaintiff had contracted a viral infection as a possible explanation for her inflammatory reaction. In addition to testing for the presence of viral antigens in the CSF samples, the laboratory performed serological tests for increased antibody titers to three common viruses: influenza A, mumps and herpes simplex.[9] Dr. Derbenwick testified that the results of these viral studies, obtained in January, 1977, favored a diagnosis of postvaccinal encephalitis, rather than viral encephalitis, since no specific viral antigen or antibody response was detected.

Although convinced that the onset of Mrs. Gassman's symptoms was due to an inflammatory encephalitic reaction to the swine flu vaccine, Dr. Derbenwick stated that it was difficult, short of an autopsy, to be certain whether the predominance of symptoms on her right side indicated that she sustained a complicating "stroke", in the sense of a vascular occlusion related to the encephalitis, or that the encephalitis was simply more focal in a region of the left cerebral hemisphere. He noted that cerebral arteriograms showed no significant vascular lesions and a computer tomography brain scan was interpreted as being within normal limits. These findings tended to disfavor the possibility that Mrs. Gassman sustained a complicating stroke.

---

**9.** The state laboratory apparently did not have the components necessary to test for reaction to swine flu particles (*See Derbenwick,* Deposition, P. 41).

Dr. Derbenwick was of the opinion, however, that if she sustained vascular complications—most likely "several small strokes"—they were secondary to her inflammatory response to the vaccine.

Dr. Derbenwick also diagnosed plaintiff as having sustained a mild polyradiculitis secondary to the encephalitis, based on the results of an electromyographic examination performed in February, 1977. Dr. Derbenwick attributed the onset and persistence of plaintiff's leg pains to this polyradiculitis. Although he was of the opinion that Mrs. Gassman did not develop a "full-blown" Guillain-Barre Syndrome, he indicated that the inflammation and irritation of nerve roots involved in plaintiff's polyradiculitis was similar to that present in cases of Guillain-Barre Syndrome, thus lending some support to the theory that plaintiff's condition resulted from the swine flu vaccine. In this regard, Dr. Derbenwick also emphasized the temporal proximity between plaintiff's receipt of the vaccine and the onset of her central nervous system symptomology (approximately eight days, with generalized muscle pains beginning within two or three days) as strongly suggesting a causal relation.

Dr. Dunne, a practicing neurologist and professor of neurology at the University of South Florida in Tampa, Florida, testified on behalf of the government. He did not treat or personally examine the plaintiff, but reviewed her medical records and the deposition of Dr. Derbenwick. Dr. Dunne concurred with Dr. Derbenwick's diagnosis that Mrs. Gassman had encephalitis, but disagreed with his conclusion that the disorder was secondary to the swine flu innoculation. Dr. Dunne stressed the fact that Mrs. Gassman had experienced transient symptoms of numbness in her right extremities during the two or three months prior to the vaccination. He concluded that plaintiff's symptoms suggested either that she had transient ischemic attacks during the months prior to receiving the swine flu shot and then developed a viral inflammation of the brain, or that her early symptoms were due to a "smoldering" encephalitis which then broke forth in mid-November 1976. Dr. Dunne admitted that the former possibility was much more likely, since cases of smoldering viral encephalitis are "very unusual" and plaintiff displayed no real hints of smoldering encephalitis, such as fever or confused thoughts.

Dr. Dunne testified that his inability to find a causal relation between plaintiff's encephalitis and the swine flu vaccine was based chiefly on his extensive review of the medical literature surrounding the swine flu program. While epidemiological studies revealed a marked increase in the incidence of Guillain-Barre Syndrome among those who received the vaccine, there was no convincing increase of cerebral neurological disorders. Dr. Dunne stated that viral encephalitis may result from a number of viral infections, and in Florida is most commonly caused by an insect bite, usually one which has previously bitten a horse. He offered no specific opinion, however, as to the cause of plaintiff's encephalitis, and stated that he could not medically rule out the possibility that it was brought on by the swine flu vaccine.

### b. *Evaluation*

■ In evaluating the testimony of Drs. Derbenwick and Dunne, the Court finds significance in the fact that Dr. Derbenwick not only personally examined the plaintiff but was her treating physician during the onset of her encephalitic symptoms through the progressive stages of her recovery. Dr. Dunne, who on the other hand has never examined the plaintiff, admitted that the opportunity to observe a patient's symptoms on a day-to-day basis as they develop and progress can be "very helpful" in formulating an opinion as to the nature and cause of a neurological disorder. (Deposition, at P. 20).[10]

10. The Court rejects the government's suggestion, in its post-trial brief, that Dr. Derbenwick was in some respect not qualified or competent to make a proper etiological evaluation of plaintiff's illness. Although not yet board certified during the period in question, it is apparent from the evidence that Dr. Derbenwick is a competent, qualified specialist in neurology who followed sound medical practices in the diagnosis and treatment of Mrs. Gassman. Indeed, the government's expert witness, Dr. Dunne, concluded his deposition with the spon-

■ Dr. Dunne stressed the fact that Mrs. Gassman displayed certain symptoms prior to receiving the shot—in particular, the intermittent numbness in her right extremities—and suggested that these symptoms may have been produced by a "smoldering viral encephalitis". Dr. Dunne himself testified, however, that such a condition would be extremely rare and that a "much more likely" explanation was that the prior symptoms were vascular in nature, produced by transient ischemic attacks, as Dr. Derbenwick concluded. (Dunne, Deposition, P. 13). Dr. Dunne further admitted that apart from the occasional spells of numbness, plaintiff showed no typical manifestations of smoldering encephalitis, such as fever or mental confusion. · A diagnosis of transient ischemic attacks, on the other hand, would appear to be consistent with plaintiff's history of hypertension (See Derbenwick, Deposition, P. 43). Accordingly, the Court finds that the symptoms which Mrs. Gassman experienced prior to her receipt of the swine flu vaccine were not due to a smoldering encephalitis, but were due to transient ischemic attacks affecting the left cerebral hemisphere.

The major reason Dr. Dunne gave for disputing Dr. Derbenwick's conclusion that the encephalitis was vaccine related was that epidemiological data collected during the swine flu program failed to show a correlation between the swine flu vaccine and encephalitis or any neurological disorder other than Guillain-Barre Syndrome. See Retialliau, et al., Nationwide Influenza Vaccine Reaction Surveillance, 1976–1977, at 3 [Defendant's Exhibit No. 35; M.D.L. Doc. # 116]. Dr. Dunne emphasized that since millions received the vaccine, the absence of a statistical correlation strongly disfavors a finding of causation between Mrs. Gassman's vaccination and the encephalitis. Significantly, however, Dr. Dunne admitted he could not rule out the possibility that Mrs. Gassman's disorder resulted from the swine flu shot, presumably due to the numerous other factors which point to the swine flu innoculation as the most likely explanation.

While the national surveillance results are clearly of importance in considering the question of causation, the Court does not accept the leap of reasoning that from such statistical data one must conclude that the swine flu vaccine could produce no neurological reaction other than Guillain-Barre Syndrome, and in particular that it could not have produced plaintiff's encephalitis. The surveillance study cited above reveals that among other neurological syndromes reported, there were eighteen cases of "encephalitis", four cases of "viral encephalitis", one case of "encephalopathy", and one case of "postvaccinal encephalitis". Id. at 15. Although these numbers were much lower than the reported cases of Guillain-Barre Syndrome (over five hundred[11]), and the overall incidence of encephalitic disorders among those vaccinated may not have risen significantly, clearly one cannot logically exclude the possibility that certain of these reported cases were caused by the swine flu vaccine (just as one cannot logically exclude the possibility that certain reported cases of Guillain-Barre Syndrome were *not* caused by the swine flu vaccine[12]). Furthermore, the surveillance study suggests that the reporting of neurological illnesses other than Guillain-Barre Syndrome may have been affected by the forms used, since many were designed solely for investigating Guillain-Barre Syndrome. Id. Finally, the proposition that Guillain-Barre Syndrome is the only neurological disorder caused by the swine flu vaccine is controverted by other Swine Flu

---

taneous remark that he thought Dr. Derbenwick "did an excellent job" (at P. 20). Dr. Derbenwick's testimony, while generally favorable to Mrs. Gassman, appeared to be objective and unbiased. Although the Court is most impressed by Dr. Dunne's qualifications and his exhaustive study of medical literature concerning the swine flu vaccine, the fact that Dr. Dunne did not concur in Dr. Derbenwick's opinion as to causation, in the Court's view, is not of itself dispositive.

11. Langmuir, The Swine Influenza Virus Vaccine—Guillain-Barre Incident in the United States 1976–1977, at 2 [M.D.L. Doc. # 110].

12. *See, e.g., Migliorini v. United States*, 521 F.Supp. 1210 (M.D.Fla.1981).

Act cases. For instance, in *Daniels v. United States*, 704 F.2d 587, 590 n. 2 (11th Cir.1983), the government admitted that the plaintiff suffered a localized brachial neuropathy as a reaction to the swine flu vaccination; and in *Unthank v. United States*, 533 F.Supp. 703, 713 (D.Utah 1982), the court found that "substantial evidence" demonstrated that the plaintiff's transverse myelitis was proximately caused by the swine flu vaccine.

It was undisputed that Mrs. Gassman's neurological syndrome included a mild polyradiculitis which produced the generalized aches and pains in her thighs beginning shortly after the vaccination. This finding by Dr. Derbenwick is significant, in the Court's view, because polyradiculitis, an inflammation of the nerve roots, is characteristic in cases of Guillain-Barre Syndrome. It would seem reasonable to conclude, therefore, in accordance with Dr. Derbenwick's testimony, that Mrs. Gassman most likely experienced an inflammatory response to the swine flu vaccine which, although idiosyncratic in that it occurred mainly in the brain, was pathogenetically related to the sort of inflammatory response, involving predominantly the peripheral nervous system, experienced in cases of postvaccinal Guillain-Barre Syndrome. (*See* Derbenwick, Deposition, PP. 40–43, 66). The testimony of Dr. Charles M. Poser, taken in the course of multi-district proceedings, lends support to this analysis. (*See* Poser, M.D.L. Deposition, PP. 18–35).

While alleging that something other than the swine flu vaccine may have triggered plaintiff's viral encephalitis, the government has failed to point to any affirmative indication of such. Indeed every indication is to the contrary. It was undisputed that the onset of Mrs. Gassman's symptoms fell squarely within the classic time frame for postvaccinal neurological disorders, including disorders caused by the swine flu vaccine. The fact that plaintiff's encephalitis was relatively mild and that she has since largely recovered are also classic characteristics of postvaccinal encephalitis associated with influenza vaccines. *See* Wyeth Package Insert, at 3 [Plaintiff's Exhibit No. 1; M.D.L. Doc. # 543]. The tests performed by the state laboratory upon plaintiff's CSF and blood samples for the possibility of viral infections all proved negative. The government offered no evidence to show that plaintiff sustained an insect bite [13] or otherwise contracted a viral infection prior to her encephalitis.[14] Accordingly, Dr. Dunne's testimony concerning other possible causes would appear to be sheer speculation.

Although both Dr. Derbenwick and Dr. Dunne agreed that absolute certainty about the nature and source of Mrs. Gassman's illness is probably not possible short of performing an autopsy, the question before the Court is only whether the plaintiff has demonstrated that her illness "more likely than not" was brought on by the swine flu vaccine. *Gooding, supra.* The Court finds that the plaintiff has proven by a preponderance of the evidence that she sustained postvaccinal encephalitis as a proximate result of her swine flu innoculation.

### 4. *Informed Consent*

In contrast with its policy in Gillain-Barre Syndrome cases,[15] the United States insists that even if Mrs. Gassman demonstrates causation between the swine flu

---

**13.** Mrs. Gassman testified that she has never been bitten by a bee; and that although she had a pet dog during fall, 1976, the dog lacked fleas due to a flea collar. No other testimony or evidence pertaining to possible insect bites was adduced.

**14.** In these respects, this case contrasts sharply with *Terrell v. United States*, 517 F.Supp. 374 (N.D.Tex.1981), in which the court concluded that the plaintiff's encephalomyelitis was not caused by the swine flu vaccine. In that case, the onset of plaintiff's illness occurred approximately six weeks after the innoculation, and it was shown that plaintiff sustained an intervening gastrointestinal infection approximately ten days before the illness. *Id.* at 377.

**15.** The United States has stipulated that if a plaintiff can prove that he or she developed Guillain-Barre Syndrome as a result of the swine flu vaccine, then the plaintiff need not establish any theory of liability in order to recover. (Final Pretrial Order, Part IX).

**1544**

vaccine and her neurological disorder, she may not recover damages unless she can also establish a theory of liability under applicable state law.[16] Plaintiff alleges that the United States is liable under Florida law for failure to obtain her informed consent in administering the vaccine.[17]

■ It is settled in this circuit that, notwithstanding the government's duty under the Swine Flu Act to develop and implement "a written informed consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered," 42 U.S.C. § 247b(j)(1)(F), the applicable standard of care respecting questions of informed consent for purposes of liability is determined by the law of the state where the plaintiff was vaccinated. *Daniels v. United States,* 704 F.2d 587, 591 (11th Cir. 1983). *Accord, Freeman v. United States,* 704 F.2d 154, 157–58 (5th Cir.1983); *Petty v. United States,* 679 F.2d 719, 727 (8th Cir.1982). The legal standard in Florida governing plaintiff's claim of lack of informed consent is set forth in the "Florida Medical Consent Law", codified at § 768.46, Florida Statutes (1977). This statute provides, in relevant part:

(3) No recovery shall be allowed in any court in this state against any physician ... in an action brought for treating ... a patient without his informed consent when:

(a)1. The action of the physician ... in obtaining the consent of the patient ... was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and

2. A reasonable individual, from the information provided by the physician, ... under the circumstances, would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians ... in the same or similar community who perform similar treatments or procedures; or

(b) The patient would reasonably, under all the surrounding circumstances, have undergone such treatment or procedure had he been advised by the physician ... in accordance with the provisions of paragraph (a).

(4)(a) A consent which is evidenced in writing and meets the requirements of subsection (3) shall, if validly signed by the patient ..., be conclusively presumed to be a valid consent. This presumption may be rebutted if there was a fraudulent misrepresentation of a material fact in obtaining the signature.

■ The statute, by its terms, sets forth threshold standards for immunity from liability based on lack of informed consent. As a practical matter, however, the statute has been construed as also delineating the required standards of care in obtaining medical consent. *See Dandashi v. Fine,* 397 So.2d 442, 446 (Fla. 3d DCA 1981); *cf. Ritz v. Florida Patient's Compensation Fund,* 436 So.2d 987, 992–93 (Fla. 5th DCA 1983). The standards set forth in § 768.46(3)(a)1 and 2, Fla.Stat., basically codify

---

**16.** By rejecting in all other cases the interpretation it has given the Swine Flu Act in Guillain-Barre Syndrome cases, the government places an unfair burden, in the Court's opinion, upon plaintiffs such as Mrs. Gassman who have proven that the swine flu vaccine caused a related inflammatory neurological disorder (See Part 3, *ante*). During a hearing on March 13, 1984, the Court inquired as to why the government's Guillain-Barre Syndrome policy should not collaterally or equitably estop it from claiming in other cases that, e.g., the informed consent form was adequate. *See Unthank v. United States,* 533 F.Supp. 703, 716–723 (D.Utah 1982) (holding

that plaintiff was entitled to compensation upon a mere showing that her transverse myelitis was caused by the swine flu vaccine). The Court is doubtful whether an approach such as that taken in *Unthank* is permissible following the decision of the Eleventh Circuit in *Daniels v. United States,* 704 F.2d 587 (11th Cir.1983). In any case the question need not be addressed in view of the Court's finding below that the plaintiff has established liability under Florida law.

**17.** All other theories of liability raised by plaintiff have been abandoned.

the duties required of medical providers under prior Florida common law: respectively, (1) that the consent be obtained in accordance with an accepted standard within the medical community, *see Thomas v. Berrios*, 348 So.2d 905, 907–08 (Fla. 2d DCA 1977); *Ditlow v. Kaplan*, 181 So.2d 226, 228 (Fla. 3d DCA 1965), and (2) that a reasonable person under the circumstances would have a general understanding of the treatment and the risks and dangers involved. *See Miriam Mascheck, Inc. v. Mausner*, 264 So.2d 859, 861–62 (Fla. 3d DCA 1972); *Bowers v. Talmage*, 159 So.2d 888 (Fla. 3d DCA 1963). It is clear under Florida law that a physician's failure to fulfill these duties constitutes negligence (except in cases where the patient otherwise would reasonably have consented to the treatment).

On the day of her vaccination, plaintiff signed a form which, upon inspection, purports to be an informed consent form.[18] It perhaps could be argued that plaintiff's signature on that form creates a conclusive presumption that her consent was valid, pursuant to § 768.46(4)(a), Fla.Stat. This presumption is conditioned, however, upon the consent meeting the requirements of § 768.46(3), Fla.Stat. As Florida's Third District Court of Appeal held in *Dandashi v. Fine*, 397 So.2d at 446:

"In determining whether the presumption [that a signed consent is valid] should apply the trier of fact is obligated to consider all the circumstances including the medical procedure proposed, the risks inherent in the procedure, and in that light, the adequacy and reliability of the means chosen to communicate the information to [the plaintiff] ...."

Accordingly, the Court must consider whether the provisions of either § 768.-46(3)(a) or § 768.46(3)(b) were satisfied under the circumstances in this case.

Paragraph 3(a) sets up a two-pronged test for evaluating the method in which a patient's consent was obtained. A salient feature of the standards prescribed under this test is that they are relative. Subparagraph 1 provides that the consent be obtained "in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community." Hence, the requisite standard of care may vary in accordance with the treatment involved, the speciality and training of the physician, and the relevant medical community. Likewise, subparagraph 2 provides that a reasonable individual, under the circumstances from the information provided, be given a general understanding of the proposed procedure, the medically acceptable alternatives, and the substantial risks and hazards of the procedure recognized among other physicians in the same or similar community who perform similar treatments or procedures. This standard, thus, may vary according to the context in which the treatment is received and the amount known about the treatment, its risks, etc. among members of the relevant medical community.

It is apparent to the Court that the circumstances under which Mrs. Gassman received her swine flu innoculation were strikingly different in many relevant respects from typical situations in which a medical procedure or treatment is administered to a patient by a local physician. The swine flu program was a federally administered and coordinated effort to innoculate the entire United States population. Participating in the program were high officials in the Department of Health, Education and Welfare along with officials and specialists in the National Institute of Allergy and Infectious Diseases, the Bureau of Biologics, and the Center for Disease

---

**18.** The form plaintiff signed nowhere contains the words "informed consent". However, on the bottom half, beneath the caption "REGISTRATION FORM", the following is written in italics: "I have read the above statement about swine [and Victoria] flu, the vaccine, and the special precautions, I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian." (See Appendix).

Control. These authorities, in consultation with the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research were assigned to develop and implement a written form and procedures for obtaining informed consent. The program thus contemplated the participation and imput of highly trained specialists in the fields of epidemiology and immunology. These specialists had at their disposal extensive and current information about the swine flu virus and other influenza viruses, and the swine flu vaccine and other similar vaccines. In addition, reports from an ongoing national epidemiological surveillance conducted by the Center for Disease Control were available. These facts must be considered in determining the relevant medical community and the standard of medical practice required under Florida law. In this regard, the Court holds that the provision of the Swine Flu Act which charges responsible federal authorities with developing and implementing a written consent form and procedures for "assuring that the risks and benefits from the swine flu vaccine are fully explained to each [recipient]", 42 U.S.C. § 247b(j)(1)(F), though not determinative, is evidence of what constitutes an "acceptable standard of medical practice" under Florida law applicable to this case.[19] Clearly, therefore, the standard of disclosure required by Florida law for administering the swine flu vaccine to the plaintiff was not on a par with the standard which, for example, might be required of a family doctor in prescribing a medication to an individual patient.

▮ In contending that the requirements of § 768.46(3)(a) were satisfied in obtaining Mrs. Gassman's informed consent, the government relies entirely upon the form which Mrs. Gassman received and signed prior to her innoculation on November 5, 1976.[20] Mrs. Gassman testified that when she received the form at the vaccination clinic, her understanding was merely that she was to fill in the requested information and to sign the form at the bottom. She remarked that she did not pay much attention to the form, and her testimony generally reflected that she was completely unaware at the time that the document was an informed consent form. Such a reaction to the form evidently was not uncommon,[21] a fact which is hardly surprising since the form nowhere contains the word "consent". (*See* note 14, *ante*).[22] A lay person about to receive the vaccine could quite reasonably view the bottom portion, labelled "REGISTRATION FORM," as being simply a means of keeping track of who had been vaccinated.[23]

The government has persuaded certain district courts that no colorable claim of lack of informed consent can be made because the form at one point states that "the possibility of severe or potentially fatal reactions exists." *Bean v. United States*, 533 F.Supp. 567, 576 (D.Colo.1980); *Marneef v. United States*, 533 F.Supp. 129, 134–36 (E.D.Mich.1981). Yet consideration of the full form reveals that the context of this language virtually nullifies its impact. One finds this language, not under the heading "Possible Vaccine Side Effects",

**19.** *Cf., deJesus v. Seaboard Coast Line Railroad Co.,* 281 So.2d 198, 201 (Fla.1973). (statutory breach as evidence of negligence).

**20.** As previously indicated, the Court finds the forms reprinted in Appendices A and B to be identical in respects material to this case. Accordingly, the Court's findings below are applicable to either form.

**21.** *See e.g., Petty v. United States,* 536 F.Supp. 860, 863 (N.D.Iowa 1980) (plaintiff "glanced" at the form and "skimmed" through it before signing); *Hasler v. United States,* 517 F.Supp. 1262, 1264 (E.D.Mich.1981) (plaintiff "scanned" and signed, but did not read the form), *rev'd on other grounds,* 718 F.2d 202 (6th Cir.1983); *Free-*

*man v. United States,* 704 F.2d 154, 156 n. 1 (5th Cir.1983) (plaintiff signed but did not recall reading the form); *Bean v. United States,* 533 F.Supp. 567, 572–73 (D.Colo.1980) (plaintiff did not recall receiving the form).

**22.** Compare the form plaintiff received with the revised bivalent vaccine informed consent form used when the program resumed on a limited basis in February 1977. (M.D.L. Doc. # 499). In the latter, the caption *"VOLUNTARY CONSENT FORM"* appears at the top of the page, and the bottom half is entitled "CONSENT".

**23.** This specific objection was raised by Dr. Robert E. Cooke during the drafting of the form (Cooke, M.D.L. Deposition PP. 78–80).

but under the inappropriate heading "Special Precautions." (*See* Jay Katz, M.D., M.D.L. Deposition, PP. 28–29; Walter Modell, M.D., M.D.L. Deposition, PP. 44–45; Sidney M. Wolfe, M.D., M.D.L. Deposition, PP. 48–49). Furthermore, the language is preceded and followed by words which, read as a whole, would appear to convey that the vaccine is unusually safe. (*See* Katz, *supra*, PP. 29–30). The "Special Precautions" section then goes on to list four groups of people who should take special precautions, conveying the possible impression that the "severe or potentially fatal reactions" language is addressed solely to these groups of people. (*See* Modell, *supra*, P. 44; Wolfe, *supra*, P. 49).

Perhaps most significant, in the Court's view, is that the form makes no mention of the risk of neurological complications, even though most experts involved in the swine flu program expected such complications to occur. (*See, e.g.,* Michael A.W. Hattwick, M.D., M.D.L. Deposition, PP. 179–190, 240–250; Windell Bradford, M.D., M.D.L. Deposition, P. 71; Henry F. Retailliau, M.D., M.D.L. Deposition, PP. 89–92; Mahlon Z. Bierley, Jr., M.D., M.D.L. Deposition, P. 27; Walter F. Dowdle, PH.D., M.D.L. Deposition, PP. 218–19; letter to J. Donald Millar, M.D. from Kathleen Acree, M.D., dated June 3, 1976 [Plaintiff's Exhibit No. 7; M.D.L. Doc. # 153]; *see also* Jay Katz, M.D., M.D.L. Deposition, P. 30; Charles M. Poser, M.D., M.D.L. Deposition, PP. 16–17). *Accord, Petty v. United States,* 536 F.Supp. 860, 869 n. 12, *vacated on other grounds,* 679 F.2d 719 (8th Cir.1982), *on remand,* 592 F.Supp. 687 at 689–90 (N.D. Iowa 1983).

Because of these material defects and omissions in the form plaintiff signed, the Court finds that the form did not enable plaintiff to make a reasonable, informed decision as to whether she should receive the vaccine, and that under the circumstances her signature did not constitute informed consent. Hence, the Court holds that the government failed to satisfy the requirements of § 768.46(3)(a)2, Fla.Stat., and was negligent under Florida law. In addition, the Court finds that the manner in which plaintiff's consent was obtained did not satisfy "an acceptable standard of medical practice" within the relevant "medical community", as the Court has construed those terms in § 768.46(3)(a)1, Fla.Stat., in light of the special circumstances of the swine flu program. The government's failure to satisfy this professional standard also constitutes negligence under Florida law.[24]

The Florida Medical Consent Law provides that even if the provisions of paragraph (3)(a) were not met, there can be no liability if "[t]he patient would reasonably, under all the surrounding circumstances, have undergone the treatment or procedure had he been advised by the physician ... in accordance with the provisions of paragraph (a)." § 768.46(3)(b), Fla.Stat.

Mrs. Gassman testified that she was concerned about the safety of the vaccine and would have elected not to receive it had she been informed of the possibility of serious neurological complications. Consequently, this Court, unlike the court in *Young v. United States,* 542 F.Supp. 1306, 1310 (S.D.N.Y.1982), is unable to conclude that a reasonable, fully informed individual in plaintiff's position would have consented to the innoculation. Accordingly, paragraph (3)(b) of § 768.46, Fla.Stat. does not shelter the government from liability based on the Court's above finding of negligence under paragraph (3)(a).

### 5. *Damages*

The Court now turns to the question of damages. Plaintiff seeks damages in the amount of $100,000.00 as compensation for her medical expenses, lost wages, pain and suffering, loss of enjoyment of life, and permanent disfigurement.

The medical expenses plaintiff incurred due to her injuries from the swine flu vaccination were shown to be $3,645.45. It was undisputed that these expenses were rea-

---

**24.** While finding that the government was negligent under Florida law, the Court's analysis is in no way intended to suggest that the swine flu program was unjustified or that any of the decisions and actions of government officials during the program were undertaken in bad faith.

sonable and necessary. Accordingly, plaintiff is entitled to compensation in that amount.

Plaintiff alleges that she was unable to return to her employment after the onset of her encephalitis, and contends that she should be compensated for lost wages through March 17, 1982, the date of her presumed retirement. The evidence showed that prior to her illness, Mrs. Gassman had worked steadily as a secretary/receptionist for an insurance agent in Daytona Beach through an employment service called "Manpower". At the time she entered the hospital, plaintiff was working approximately 35 hours per week at an hourly wage of $2.75.

Dr. Derbenwick testified that Mrs. Gassman's post-vaccinal encephalitis left her completely disabled at least through the summer of 1977. In subsequent examinations conducted in 1980, Dr. Derbenwick found that Mrs. Gassman's residual symptoms included some slowness in thinking and calculating, a variable right facial droop, some persistent radicular pains in her thighs while standing or sitting, a general loss of energy, some weakness in her right leg, and pain and weakness in her right arm and hand, including a decrease in handwriting. The Court finds that in view of these persistent residual symptoms, Mrs. Gassman was unable to return to her employment during the period between her admission to Ormond Beach Memorial Hospital and the date of her presumed retirement. At the time she became ill, plaintiff's hourly wage was $.45 above the statutory minimum. Accordingly, the Court finds that plaintiff is entitled to wages in that amount, taking into account statutory adjustments in the minimum wage, through March 17, 1982. *See* 29 U.S.C. § 206(a)(1), amended November 1, 1977. Plaintiff's total award of lost wages, therefore, equals $32,028.50.[25]

The pain and suffering plaintiff experienced was most acute during the first few months following the vaccine. Following her hospitalization, plaintiff was bedridden for approximately one month and had difficulty maneuvering on her own in the immediate months thereafter. Plaintiff also experienced extreme radicular pains and weakness in her right extremities, which to some extent have persisted. Accordingly, the Court finds that plaintiff is entitled to compensation for pain and suffering in the amount of $15,000.00.

Plaintiff contends that the neurological disorder caused by the swine flu vaccination has permanently impaired her ability to lead a normal life. The testimony of Mrs. Gassman, Mr. Gassman and Kathryn Carter, a family friend, established that prior to the vaccination Mrs. Gassman regularly participated in a number of recreational and social activities, including outings on the cabin cruiser she and her husband owned, dining and dancing at the yacht club to which they belonged, and homemaking and gardening around their house. Following her illness, however, plaintiff has been largely unable to participate in and enjoy these activities, due to feelings of pain, weakness and fatigue, and unsureness in her footing. The Court finds that plaintiff is entitled to $30,000.00 compensation for her inability to lead a normal life, covering her life expectancy of approximately 16 years following the vaccination.

Plaintiff finally seeks compensation for permanent disfigurement resulting from the swine flu innoculation. It was shown that Mrs. Gassman now has a noticeable droop on the right side of her mouth which becomes more exaggerated when she tires. Plaintiff testified that this disfigurement is the source of much humiliation and embarrassment. As compensation for this disfigurement, the Court finds that plaintiff is entitled to $10,000.00.

**25.** Calculation of plaintiff's lost wages:

```
11/19/76-12/31/77=58 wks. x 35 hrs. x $2.75/hr.=$5,582.50
1/01/78-12/31/78=52 wks. x 35 hrs. x $3.10/hr.=$5,642.00
1/01/79-12/31/79=52 wks. x 35 hrs. x $3.35/hr.=$6,097.00
1/01/80-12/31/80=52 wks. x 35 hrs. x $3.55/hr.=$6,461.00
1/01/81-03/17/81=62 wks. x 35 hrs. x $3.80/hr.=$8,246.00
 TOTAL =$32,028.50
```

The total award of damages to which plaintiff is entitled in accordance with the above findings is $90,673.95.

### 6. *Conclusion*

In summary, the Court finds and concludes that plaintiff Emma Gassman developed inflammatory encephalitis and polyradiculitis as a proximate result of the swine flu vaccine, that the defendant United States was negligent under the law of Florida in failing to obtain plaintiff's informed consent prior to administering the vaccine, and that plaintiff is entitled to compensatory damages from the defendant in the amount of $90,673.95.

A separate judgment will be entered in accordance with this opinion.

SO ORDERED.

### APPENDIX "A"

### IMPORTANT INFORMATION ABOUT SWINE INFLUENZA (FLU) VACCINE (MONOVALENT)

July 15, 1976

The Disease

Influenza (flu) is caused by viruses. When people get flu they may have fever, chills, headache, dry cough or muscle aches. Illness may last several days or a week or more, and complete recovery is usual. However, complications may lead to pneumonia or death in some people. For the elderly and people with diabetes or heart, lung, or kidney diseases, flu may be especially serious.

It is unlikely that you have adequate natural protection against swine flu, since it has not caused widespread human outbreaks in 45 years.

The Vaccine

The vaccine will not give you flu because it is made from killed viruses. Today's flu vaccines cause fewer side effects than those used in the past. In contrast with some other vaccines, flu vaccine can be taken safely during pregnancy.

One shot will protect most people from swine flu during the next flu season; however, either a second shot or a different dosage may be required for persons under age 25. If you are under 25 and a notice regarding such information is not attached, this information will be provided to you wherever you receive the vaccine.

Possible Vaccine Side Effects

Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache, or muscle aches within the first 48 hours.

Special Precautions

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

- Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.
- People with known allergy to eggs should receive the vaccine only under special medical supervision.
- People with fever should delay getting vaccinated until the fever is gone.
- People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

*If you have any questions about flu or flu vaccine, please ask.*

---

REGISTRATION FORM

*I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian.*

| INFORMATION ON PERSON TO RECEIVE VACCINE | | FOR CLINIC USE |
|---|---|---|
| Name (Please Print) | Birthdate Age | Clinic Ident. |
| Address | County of Residence | Date Vaccinated |
| | | Manufacturer and Lot No. |

Signature of person to receive vaccine or Parent or Guardian Date

CDC 7.31
7-70 U.S. Department of Health, Education, and Welfare/Public Health Service/Center for Disease Control/Atlanta, Georgia 30333

---

APPENDIX "B"

## IMPORTANT INFORMATION ABOUT SWINE AND VICTORIA INFLUENZA (FLU) VACCINE (BIVALENT)

July 15, 1976

### The Disease

Influenza (flu) is caused by viruses. When people get flu they may have fever, chills, headache, dry cough or muscle aches. Illness may last several days or a week or more, and complete recovery is usual. However, complications may lead to pneumonia or death in some people. For the elderly and people with diabetes or heart, lung, or kidney diseases, flu may be especially serious.

It is unlikely that you have adequate protection against swine flu, since it has not caused widespread human outbreaks in the past 45 years. You may or may not have adequate protection against Victoria flu, although many Americans had this flu last winter. It was responsible for over 12,000 deaths.

### The Vaccine

The vaccine will not give you flu because it is made from killed viruses. Today's flu vaccines cause fewer side effects than those used in the past. In contrast with some other vaccines, flu vaccine can be taken safely during pregnancy.

One shot will protect most people from swine and Victoria flu during the next flu season: however, either a second shot or a different dosage may be required for persons under age 25. If you are under 25 and a notice regarding such information is not attached, this information will be provided to you wherever you receive the vaccine.

### Possible Vaccine Side Effects

Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache, or muscle aches within the first 48 hours.

### Special Precautions

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

- Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.
- People with known allergy to eggs should receive the vaccine only under special medical supervision.

- People with fever should delay getting vaccinated until the fever is gone.
- People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

*If you have any questions about flu or flu vaccine please ask.*

------------------------------------------------------------

REGISTRATION FORM

*I have read the above statement about swine and Victoria flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian.*